**UNITED STATES v. 443.6 ACRES OF LAND IN BARNES COUNTY, N. D., et al.**

**Civil Action No. 1505.**

District Court, D. North Dakota, S. W. D.

Jan. 29, 1948.

---

[1] No opinion for publication.

86

P. W. Lanier, U. S. Dist. Atty., of Fargo, N. D., and J. P. Stevens, Asst. U. S. Dist. Atty., of Minot, N. D., for plaintiff.

C. F. Kelsch and John F. Lord, of the firm of Sullivan, Fleck, Kelsch & Lord, all of Mandan, N. D., for defendants Wallace Lee, Laura Lee, and Roger W. Lee.

VOGEL, District Judge.

This is a land condemnation case wherein the sole question involved is the amount of damage to be recovered by landowners as the result of a taking of a portion of their lands for Governmental use in connection with what is known as the Baldhill Dam Project. The case was tried to a jury and resulted in a jury's determination of damage in the amount of $24,000. The land actually taken by the Government totaled 320.4 acres. Such land was a portion of an entire unit consisting of 522 acres. The jury's verdict of $24,000 contemplates not only the value of the 320.4 acres, but also any damage resulting to the landowners in decreased market value of the portion of the tract still remaining to them. The Court is presently concerned with a motion for a new trial or in the alternative a remittitur made in behalf of the United States.

The burden of proof of establishing the amount of damages sustained by the landowners rested upon the owners themselves. In their behalf, they introduced the testimony of four witnesses, three of whom were the three owners themselves. An owner of property is recognized in the law as a proper person to testify and express an opinion as to its market value or the amount of damage sustained by reason of the taking of a portion of such property. The weight to be given an owner's testimony is for the jury's determination. In addition to their own testimony, the owners offered the testimony of one G. E. Nelson who, for the past number of years, has been engaged in the real estate business at Valley City in the same county in which the land involved is situated. Prior thereto, he had been an appraiser for the Farm Credit Administration. At the request of the owners, he appraised the farm involved in August, 1947. He gave his opinion of the market value of the entire unit as $28,550, and the value of the remaining land, after the taking, as $2,616, or a damage of $25,934. He buttressed his opinion of market values by breaking down the various elements involved, testifying to the value of the improvements to the farm, the value of cultivated land and the value of pasture land. The three individual owners testified to damage by reason of the taking, their opinions varying from $31,450 to $32,843.

In support of their estimates of damage, which was the difference between the market value of the entire unit before the taking and the market value of the tract remaining after the taking, the owners testified to values of the various improvements, the values of different portions of the unit, such as crop land and pasture land, and also gave figures showing net income received as a result of operating the farming unit over the past number of years.

The entire farming unit is mainly valley land, following the Sheyenne River on both sides, the flat lower areas being used for crop land and the rough higher portions being used for pasture. That portion condemned by the Government and taken herein follows the course of the river, taking most of the more valuable land and leaving strips or portions uncon-

nected. In other words, the condemnation proceedings cut the heart out of the farming unit, resulting in what is sometimes termed serious severance damage to the remaining portions. Subsequent to the taking, and in order to replace the land condemned, the owners testified to purchasing other nearby land at a cost of $50 per acre. There was testimony that the land purchased for $50 per acre was not nearly so well improved as that taken, was overrun by foul weeds, and would have to be worked before it became really good farm land. There was other testimony in the record to the effect that the land purchased by the owners for $50 per acre was some of the best land in Barnes County.

The Government introduced the testimony of three experts on land values. The first was C. A. Jenkins, of St. Paul, Minnesota, who had enjoyed many years of experience as an appraiser of farm property and is employed at the present time by the United States Corps of Engineers. He had formerly been employed in the capacity of appraiser by the Union Central Life Insurance Company, by the Federal Housing Administration and by the Federal Land Bank of St. Paul. He testified to familiarity with land values in Barnes County. He made his examination and appraisal of this tract in August, 1947, and arrived at a total damage of $15,300, which included, as he stated, severance damage to the land remaining after the taking.

The Government's second witness was William Toussaint, of Fargo, North Dakota, who for some years has been engaged in the farm loan and real estate business. He examined the land in November, 1947. He estimated the market value of the land taken at $12,000 and the damage to the land not taken at $3,970, or a total damage of $15,970.

The Government's third witness was Gust Hoberg, of Fargo, North Dakota, who also has been in the real estate business for a number of years. He examined the lands involved in November, 1947. He arrived at a total damage to the landowners of $16,168.

Through cross examination of the owners, the Government was able to bring out that the farm in question was purchased by them from the Federal Land Bank of St. Paul in 1940 for the sum of $6,000. Prior to the time of purchase, the owners had been renters, residing on and operating the land.

The jurors had before them, then, the testimony of four witnesses representing the landowners and three witnesses representing the Government, with a range of damage extending from a low of $15,300 to a high of $32,843, and made up as follows:

Landowners' witnesses:

| | |
|---|---|
| G. E. Nelson | $25,934.00 |
| Roger Lee (owner) | 32,843.00 |
| Wallace Lee (owner) | 32,830.00 |
| Laura Lee (owner) | 31,450.00 |

Government witnesses:

| | |
|---|---|
| C. A. Jenkins | 15,300.00 |
| William Toussaint | 15,970.00 |
| Gust Hoberg | 16,168.00 |

In the motion for a new trial or in the alternative a remittitur, the Government assigns some thirteen grounds as a basis therefor. The Government's main complaint, of course, is that the verdict is excessive and it asks for a new trial or in the alternative a remittitur of $8,000, thus cutting down the amount of damage from $24,000, as assessed by the jury, to $16,000, which approximates the values testified to by the three Government witnesses.

The landowners were entitled, under the law, to have a jury assess the amount of damages sustained by them as a result of the Government's exercise of its right of eminent domain through the taking of a portion of their lands. The jury's verdict assessing that damage may not be disturbed by the Court unless it is clearly erroneous, is unsupported by substantial testimony, is clearly contrary to the weight of the competent testimony, is based upon error, or is the result of passion, prejudice or caprice.

Regardless of the Court's own opinion of the amount of damages sustained by the

landowners, the Court could not, in the absence of any of the elements heretofore set forth, substitute its judgment for the judgment of the jurors. By so stating, this Court is not intimating whether it agrees or disagrees with the amount of the jurors' verdict. As long as we are to have jury trials and as long as litigants are entitled to have their cases tried before and determined on jury verdicts, that must be true, unless one of the elements above mentioned is present, and in such event the Court has the right and the duty to act as may seem most just in the premises, either by granting a new trial or in the alternative a remittitur.

It will be noted that the jury's verdict of $24,000 is midway between the high of $32,000 testified to by the landowners themselves and a low of $16,000 testified to by the Government's witnesses, and is approximately $2,000 under the testimony of the witness Nelson. Nelson was a competent witness whose testimony may not be disregarded. The weight of his testimony was for the jury. The same is true of all others who testified as to valuations.

■ It cannot be said, then, that the jury's verdict is unsupported by substantial testimony, nor can it be said that it is clearly contrary to the weight of the competent testimony in the record. It is midway between the high and the low, and I believe this Court would be in error to set aside the verdict or to order a remittitur as an alternative on any such assigned grounds.

In their brief and arguments, the Government's representatives ask this Court to invoke what they "recognize to be novel in American jurisprudence, namely the common sense rule that permits a court to exercise its general and common knowledge of values of land in North Dakota and in the vicinity of the proposed Baldhill Dam in connection with the evidence and the pictures of said land in evidence in the case rather than to be stultified by being forced to close its eyes to a truth that the court must admit exists." That can be construed as nothing more or less than a request that this Court substitute its judgment for the judgment of the jury, and as pointed out, that would be improper under the evidence herein.

■ They also complain that the jurors' verdict is based in a substantial way upon the valuation given to improvements on the land. All of the witnesses, without exception, I believe, arrived at their opinions of damage by subtracting what they estimated to be the market value of the remainder from the market value of the unit as a whole and subsequently, with one exception, they attempted to substantiate their conclusions by giving or expressing opinions regarding the various improvements on the farm. This was true of both Government as well as owners' witnesses. It strikes me that the method was eminently proper, and that no error was committed in allowing the witnesses to so testify, and that no confusion or misunderstanding on the part of the jury resulted in the admission of such testimony.

■ Government's counsel also complained because the Court sustained defendants' objection to a Government's offer of proof which arose in the following manner: Roger W. Lee, one of the landowners, was being cross examined by Mr. Lanier, United States District Attorney, who asked the witness the following question:

"Q. Now, Mr. Lee, the buildings on this property that has been taken by the Government, located here (indicating), about which you have heretofore testified, you have already purchased those buildings from the United States Government, have you not?

"Mr. Lord: Just a moment; that is incompetent, irrelevant and immaterial. It is objected to on the further ground that disclosure has been here made that I was assured would not be made in the trial of this suit."

Thereupon, out of the hearing of the jury, Mr. Lord, one of the attorneys for the landowners, stated to the Court:

"Mr. Lord: The same stipulation was submitted to the St. Paul Engineers' office regarding the repurchase of these buildings, which was made at salvage value after the condemnation and after the taking, and I was told point blank that the same ar-

rangement would be made as at Garrison, and that the fact of the repurchase and the price of the repurchase· would not be disclosed in the trial of the condemnation.

"Mr. Lanier: I don't find anything in that stipulation, Mr. Lord, to that effect. This is the first I have seen the stipulation.

"Mr. Lord: That is the agreement subsequent to the stipulation. I conferred

"Mr. Lanier: There is no agreement with me as the United States Attorney for this district."

Subsequently, Mr. Lanier made the following offer of proof:

"Mr. Lanier: We would like to make the offer of proof and make it so it can't be heard by the jury. At this time, the plaintiff offers to prove by the witness that subsequent to the taking, the Government sold to him the buildings and properties for the sum of $1300.00 by right of removal of same."

Objection to the offer of proof was sustained and error is assigned by reason thereof.

Disregarding Mr. Lord's statement with reference to the agreement he had with the Army Engineers regarding the fact that no disclosure would be made of the fact of repurchase of the buildings by the landowners and the amount paid therefor, the Court is of the opinion that the objection to the offer of proof was well taken. In the first place, this was in the nature of a forced sale made subsequent to the time of the taking of the land. It was not a sale in the open market between a willing seller, not forced to sell, and a willing buyer, not forced to buy. The price paid must of necessity have contemplated the cost of tearing down and removing and then rebuilding the structures in question. The offer of proof includes nothing with reference to such costs. It merely offers to show to the jury the amount paid by these parties for the salvage that could be obtained from the dismantlement and removal of the farm structures, one of which was a concrete silo. I question if the amount paid for such salvage would be at all helpful to the jury in determining the market value of the premises prior to the taking, and that is particularly true when there was no offer to establish the cost of demolishing the buildings and hauling away such salvage as might thereafter be made useful. The Court finds no error in the ruling complained of.

█ Government's counsel complain that the verdict of the jury is based upon "boom prices and boom production, and upon net earnings of the lands over a boom period." In that connection, the Court charged the jury as follows:

"You are charged that if you find that at the time of the taking there was a free and open market for the sale of real estate such as the Government has taken in this proceeding, then the landowners are entitled to recover the fair market value of their lands at such time, notwithstanding that such fair market value might have been abnormally high."

No exception was taken to that portion of the charge by any of the parties and the Court believes that it correctly states the law. To hold otherwise would, in effect, be taking property without just compensation and hence contrary to the Fifth Amendment to the Constitution of the United States. If this is a period of monetary inflation—and I doubt if there is serious question in anyone's mind but what it is—then if the Government were allowed to condemn property but to pay for it at depression or even so-called normal valuations, the owners would be the losers in that they would not have received the market value for their property at the time of the taking. The Government chose to take this land in 1947 and must be held to the market value as of that time. The landowners had no choice as to the time of taking. Their sole right herein is to receive for their property its money equivalent at the time of taking. That is measured by market value. To hold otherwise would be allowing the Government to "take private property without paying just compensation therefor" as surely as if the Government had taken the property or· a portion of it without paying anything. It is merely a matter of degree. We are bound herein by the market value as of the time of the taking, not as of any other

time. The fact that we now suffer from inflation, that prices are high and money cheap in comparison with other times cannot change the rule. The landowners could sell their land to others and receive its market value. In exercising its right of eminent domain, the Government must pay that market value, be it high or low.

▆ The landowners were allowed to testify as to their net earnings from the farm in question. The Eighth Circuit Court of Appeals has said, in Clark, et al. v. United States, 155 F.2d 157, 162:

"In eminent domain proceedings the rule is that all facts which an ordinarily prudent man would take into account before forming a judgment as to the market value of property he contemplates purchasing is relevant and material. The landowner should be allowed to state and to have his witnesses testify to every fact concerning the property which he would normally or ordinarily be disposed to put forth in order to place it in an advantageous light if he were attempting to negotiate a sale of it to a private individual. He was entitled to present to the jury all the elements reasonably affecting the value of the property for all uses for which it was suitable."

The Court believes that any prudent prospective purchaser would inquire and ascertain the facts with reference to the past production on lands he contemplated buying, and that an ordinarily prudent seller, provided he were pleased with what he had produced on the land he was willing to sell, would wish to disclose to a prospective purchaser what the land had produced and what his profits therefrom had amounted to. The jurors were entitled to have this information, not as a measure or standard of value but for their consideration in determining the weight that they would give to the testimony of witnesses who buttressed their opinions by such facts. They were so charged by the Court and no exception was taken to the charge. There was no error in the admission of the testimony.

▆ The Government complains that the verdict is the result of prejudice, passion and caprice, but points to nothing which could in any way justify such a conclusion, and the Court is completely unaware of anything which occurred during the trial from which such a conclusion could be drawn.

▆ The Government also complains that the verdict was a quotient verdict but points to nothing to sustain that contention. The Court very carefully instructed the jurors not to arrive at a verdict through quotient methods. The instruction was adequate and, I believe, in every way complete. The Court knows of nothing which would indicate that the jurors did not follow the instructions.

The Court is of the opinion that the motion for a new trial or in the alternative for a remittitur should be in all things denied. It will be so ordered.